UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DWAYNE FREEMAN,

                    Plaintiff,

          -v-                                    6:12-CV-06045 (MAT)
                                                 **DECISION AND ORDER**

ROCHESTER PSYCHIATRIC CENTER,

                    Defendant.

_____

## I.   Introduction

          On  January  25,  2012,  *pro  se*  plaintiff  Dwayne  Freeman
("plaintiff")commenced  the  instant  action  against  his  employer,
defendant  Rochester  Psychiatric  Center  ("defendant  or  "RPC"),
alleging  discrimination  and  retaliation  pursuant  to  Title  VII  of
the  Civil  Rights  Act,  42  U.S.C.  §§  2000e  *et  seq.*  ("Title  VII").
Fact  discovery  in  this  matter  has  closed,  and  the  parties  have
filed  competing  motions  for  summary  judgment.    Docket  Nos.  182,
219.    For  the  reasons  discussed  below,  plaintiff's  motion  for
summary  judgment  is  denied  and  defendant's  motion  for  summary
judgment  is  granted.

## II.  Background

          The  following  facts  are  taken  from  the  respective  statements
of  fact,  affidavits,  and  exhibits  submitted  by  plaintiff  and
defendant.

          Plaintiff  was  hired  by  RPC  as  a  mental  health  treatment  aide
("MHTA")  on  July  31,  2002.    Plaintiff  initially  worked  on  the  night

shift, which he described at his deposition as being "quieter" and "calmer" than the day shift. Plaintiff further testified that he received a pay differential of an additional 20 cents per hour for working the night shift.

In July 2009, plaintiff received a written counseling due to his behavior towards LeeAnn Weaver, a registered nurse employed by RPC. On July 9, 2009, Ms. Weaver asked plaintiff to inform her or another employee if he was leaving a particular area of the RPC building. Plaintiff felt that Ms. Weaver had used a demeaning tone of voice in making this request, and called Sandra Lucas, one of RPC's nurse administrators, requesting that she come to the floor in order to prevent him from "cursing out" Ms. Weaver. Ms Lucas mediated the dispute, but on July 12, 2009, another RPC employee witnessed plaintiff staring/glaring at Ms. Weaver in an intimidating fashion. Plaintiff was issued a written counseling on July 22, 2009, which stated that he had engaged in "continuing inappropriate behavior" towards Ms. Weaver that needed to stop. Docket No. 142 at 12. The written counseling further informed plaintiff that it was inappropriate for him to do push-ups on the floor while working. When he received the written counseling, plaintiff denied the allegations and refused to sign the document. Plaintiff filed a grievance related to his receipt of the written counseling, which was denied on November 10, 2009. Plaintiff appealed the matter further, and a hearing was conducted on

February 24, 2010.  On June 16, 2010, plaintiff received a letter from Virginia Kirby from the New York State Office of Mental Health (the "OMH") informing him that there had been no violation of his contract, that the counseling did not constitute discipline, and that his grievance remained denied.

On August 26, 2009, another of RPC's registered nurses, Trudy Stevens, sent an email to Ms. Lucas in which she stated that plaintiff had stared at her for an entire shift and that she believe he was trying to intimidate her.  Ms. Stevens reported that plaintiff had engaged in similar behavior on other occasions and that it made her feel very uncomfortable.  It is not clear from the record what action, if any, was taken in response to Ms. Stevens' complaint.

Although the record is not clear as to when, plaintiff apparently at some point began a personal relationship with Deb Hancoski, a fellow RPC employee.  That relationship ended and Ms. Hancoski subsequently told other individuals at RPC that plaintiff had inappropriately touched her at the Rochester Lilac Festival (the "Lilac Festival") in May 2009.  Plaintiff alleges that in December 2009, he informed Ms. Lucas that Ms. Hancoski was spreading false tumors about him and that she informed him it was his problem to deal with.  On March 22, 2010, plaintiff filed two grievances in which he alleged that Ms. Hancoski was slandering him and had been doing so for six to seven months, and that no action

had been taken despite his prior report to Ms. Lucas. At the time these grievances were submitted, plaintiff's union representative Andre Medlock requested that they be placed on hold, so that the issues could be addressed informally. However, plaintiff claims to have subsequently learned that Ms. Hancoski continued telling people he had tried to touch her inappropriately. Plaintiff filed an additional grievance related to Ms. Hancoski on April 22, 2010. On June 7, 2010, plaintiff sent an email to Mr. Medlock, Ms. Lucas, Barbara McMullen (RPC's assistant director of nursing) and Christopher Kirisits (RPC's director of nursing) in which he stated that he was making a formal complaint against Ms. Hancoski for having allegedly told Mary Uerkvitz, another RPC MHTA, that plaintiff had molested her in a park. Plaintiff denied Ms. Hancoski's allegations, describing them as slander and defamation, and requested that she be given a written counseling.

On July 13, 2010, Cynthia Crowell, RPC's affirmative action administrator assistant, received a report that Ms. Hancoski had told her charging nurse that plaintiff had sexually harassed her. Ms. Crowell communicated this allegation to Mr. Kirisits and Ms. McMullen.

In August 2010, plaintiff was involved in another incident with Ms. Stevens, who was a supervisor at the time. According to plaintiff, at approximately 5 a.m., an alarm went off because one patient had entered another patient's bedroom. Plaintiff entered

the nurses' station, where Ms. Stevens was seated, to turn the alarm off. Plaintiff left to investigate the situation, then returned to the nurses' station to turn the alarm back on. Ms. Stevens asked plaintiff "is everything okay," but he did not respond to her question. Ms. Stevens then allegedly stood in the doorway of the nurses' station, blocking plaintiff's ability to exit, and asked him why he had not answered her question. Plaintiff claims that he asked Ms. Stevens to please move out of his way, which she eventually did. Ms. Stevens reported this incident to Ms. Lucas and, on August 14, 2010, plaintiff was given a written counseling for having refused to answer a supervisor's question about a patient situation. Upon receipt of the written counseling, plaintiff had a conversation with Ms. Lucas in which he asked her what was going to be done to Ms. Stevens for having blocked his path, and Ms. Lucas told him she couldn't discuss the disciplinary status of other employees. Ms. Lucas further informed plaintiff that RPC management was considering moving him to the day shift due to his repeated conflicts with his co-workers, and plaintiff opined that there was a double standard when it came to assessing allegations against him versus the allegations he made against other people. On August 16, 2010, plaintiff filed a grievance related to the incident, in which he claimed that Ms. Stevens had engaged in workplace violence and requested that Ms. Stevens be reprimanded.

Plaintiff, Mr. Medlock, and Christine Hally, RPC's director of human resources management, met on August 30, 2010, to discuss plaintiff's grievances. On September 7, 2010, plaintiff was placed on administrative leave with pay, pending an investigation into the allegations he and Ms. Hancoski had made against one another.

On September 10, 2010, Cheryl Brice, another MHTA at RPC, sent a note to Ms. Crowell in which she expressed concern about plaintiff's mental stability. Ms Brice expressed her belief that plaintiff was "the type of person that would go postal" and stated that plaintiff had asked his co-worker Ms. Uerkvitz if she would kill another person if she knew she would not get caught. Docket No. 142 at 30. On September 11, 2010, Ms. Uerkvitz told Ms. Lucas that, on August 30, 2010, plaintiff had asked her if she would kill someone if she knew she could get away with it. Ms. Uerkvitz stated that she had replied "oh God no, why would you even say that" and that plaintiff told her that he "would definitely kill someone if [he] could." *Id*. at 31. Ms. Uerkvitz further stated that plaintiff's statement "sent a chill down [her] spine" and that "he was sincere in his words." *Id*. At his deposition, plaintiff claimed that his conversation with Ms. Uerkvitz about killing people was in the context of a discussion of their favorite television shows, and that he had told her his favorite television show was *Dexter*, and that he admired the main character on that program and wished he could be like him. The Court takes judicial

notice that *Dexter* is a television program in which the main character is a serial killer who murders people who have committed horrific crimes.

On September 13, 2010, Ms. Hally sent a letter to plaintiff denying his grievance regarding the August 2010 incident with Ms. Stevens, explaining that Ms. Stevens' question had been appropriate and legitimate and that plaintiff had admitted he specifically chose to ignore her. Ms. Hally noted that there had been no physical contact between plaintiff and Ms. Stevens and concluded that it was not an act of workplace violence but rather "an act of disrespect between co-workers." Docket No. 142 at 21.

On September 28, 2010, Ms. Hally authored an Investigaton Report regarding plaintiff's comments to Ms. Uerkvitz. Ms. Hally noted that she had interviewed Ms. Uerkvitz on September 15, 2010 and September 23, 2010, and that Ms. Uerkvitz told her the following: (1) approximately six months earlier, Ms. Hancoski had told Ms. Uerkvitz that plaintiff made inappropriate contact with her at the Lilac Festival in 2009; (2) Ms. Uerkvitz had no memory of having discussed television shows with plaintiff during the conversation in which he said he would kill someone if he could get away with it; and (3) Ms. Uerkvitz was concerned about plaintiff's behavior and his interactions with co-workers he disliked. Ms. Hally also reported that plaintiff had asked another co-worker to be a reference for him for a pistol permit. Ms. Hally's notes from

her conversation with Ms. Uerkvitz on September 15, 2010, indicate that Ms. Uerkvitz told her that plaintiff hated several of his coworkers, including Ms. Weaver and Ms. Hancoski, and that he had told Ms. Uerkvitz that he hoped Ms. Hancsoki died and that he was not kidding.

On September 30, 2010, Ms. Hally sent plaintiff a letter regarding his grievances related to Ms. Hancoski. She informed plaintiff that, due to the nature of the allegations, management had engaged the assistance of the OMH Bureau of Diversity to review the situation. On October 1, 2010, Ms. Hally sent plaintiff a letter informing him that RPC had determined that his continued presence on the job constituted a danger to patients and co-workers. Accordingly, he was placed on an involuntary leave of absence and required to undergo a psychiatric evaluation.

On November 11, 2010, Ms. Crowley sent plaintiff a letter in which she stated that a thorough investigation of Ms. Hancoski's allegation had been conducted and that there was "sufficient evidence to support the allegation was true." Docket No. 209-3 at 42. However, because the incident between plaintiff and Ms. Hancoski had occurred more than a year earlier, RPC was unable to take corrective action against plaintiff under the terms of his contract. As a preventive measure, it was recommended that plaintiff attend sexual harassment prevention training.

On November 19, 2010, plaintiff was sent a letter informing

him that he would be returning to work as of November 23, 2010 (on which day he would attend sexual harassment training prevention) and that he would be reassigned to the day shift effective December 23, 2010, "based upon Facility operational needs." Docket No. 209-3 at 70.

On December 3, 2010, plaintiff received a notice of discipline related to his comments to Ms. Uerkvitz. The notice of discipline indicated that plaintiff had engaged in misconduct/incompetence by making inappropriate and alarming comments about killing people and that, as a result, he would be suspended for four weeks without pay.

Plaintiff commenced the instant action on January 25, 2012, naming as defendants RPC, Ms. Crowell, Mr. Kirisits, Ms. Lucas, Ms. MacMullen, and Michael Zuber of the OMH. The individual defendants were dismissed from this action by Court order on December 2, 2013. Defendant filed its motion for summary judgment on January 20, 2017, and plaintiff filed a cross-motion for summary judgment on June 30, 2017.

## III. Discussion

### A. Legal Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law.  When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. *See Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014).  If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007), citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).  A party opposing a motion for summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87).

**B.  Disparate Treatment Claim**

Plaintiff alleges that RPC discriminated against him on the basis of his race (African American) and his gender (male). Under Title VII, a motion for summary judgment on a claim of disparate treatment is assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Pursuant to this framework, the plaintiff must first demonstrate a *prima facie* case of discrimination.  To establish a *prima facie* case, plaintiff must demonstrate that: "(1) [he] was within the protected class; (2)

[he] was qualified for the position; (3) [he] was subject to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009). If plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse act]." *Id.* at 499 (internal quotations and citation omitted) (alteration in original). "Once such a reason is provided, the plaintiff can no longer rely on the *prima facie* case, but may still prevail if []he can show that the employer's determination was in fact the result of discrimination." *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). The plaintiff is required to "demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Leibowitz*, 584 F.3d at 499 (internal quotations and citation omitted).

Here, defendant does not contest that plaintiff has met his burden with respect to the first two elements of his *prima facie* case - namely, that he is a member of a protected class and that he was qualified for his position as an MHTA. However, defendant contends that plaintiff cannot establish a *prima facie* case of discrimination, because he did not suffer an adverse employment action and because, even assuming *arguendo* that he had,

such adverse action did not take place under circumstances giving rise to an inference of discrimination. The Court has considered the parties' arguments and, for the reasons discussed at length below, concludes that, while plaintiff has shown a genuine issue of material fact as to whether or not he suffered an adverse employment action, he has failed to present any competent evidence that such action was the result of unlawful discrimination. The Court further concludes that defendant had legitimate, non-discriminatory reasons for its actions and that such reasons were not pretextual.

### 1. Adverse Employment Action

In order to prevail on his discrimination claim, plaintiff is required to present competent evidence that he suffered an adverse employment action. The Second Circuit has defined an adverse employment action as a "materially adverse change" in the terms and conditions of the plaintiff's employment. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003) (internal quotation omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or

other indices . . . unique to a particular situation." *Id.* (internal quotations marks omitted).  Here, considering the disputed facts in the light most favorable to plaintiff, the Court concludes that there is a genuine issue of material fact regarding whether he suffered an adverse employment action.

Plaintiff contends that his transfer from the night shift to the day shift constituted an adverse employment action because it caused him to lose the night shift pay differential and because it caused him to lose seniority.  "Unfavorable hours do not constitute an adverse employment action for the purposes of Title VII." *Antonmarchi v. Consol. Edison Co. of New York*, 2008 WL 4444609, at *14 (S.D.N.Y. Sept. 29, 2008) (further holding that "[p]laintiff being forced to work on the night shift cannot constitute an adverse employment action").  As such, the mere transfer of plaintiff from the night shift to the day shift, without more, plainly did not constitute an adverse employment action.  However, "[t]ransfer to an undesirable work shift may constitute a materially adverse change in the terms and conditions of employment if it results in other unfavorable consequences." *Turner v. Davidson/Gilmour Pipe Supply*, 2006 WL 1652613, at *8 (E.D.N.Y. June 14, 2006) (emphasis added); *see also Ifill v. United Parcel Service*, 2005 WL 736151, at * (S.D.N.Y. March 29, 2005) ("[A] lateral transfer, even if imposed on an employee involuntarily, does not constitute an adverse employment action unless it is

accompanied by some other material adverse change in conditions, such as a reduction in pay or status.") (emphasis added).  Here, plaintiff has alleged that his transfer to the day shift resulted in a diminution of his pay and a loss of seniority.

The minor diminution in plaintiff's pay as a result of his transfer is likely not enough, standing alone, to establish the existence of an adverse employment action.  Plaintiff testified at his deposition that employees working the night shift received an additional 20 cents per hour.  Assuming a 40 hour work week, loss of the pay differential would amount to roughly $400 dollars per year, or approximately 1% of plaintiff's $40,000 per year earnings. "This is not the significant change in benefits required for an adverse employment action." *Sarver v. Staples the Office Superstore E., Inc.*, No. 2:12-CV-374-JMS-MJD, 2014 WL 1571221, at *6 n.6 (S.D. Ind. Apr. 17, 2014) (finding that plaintiff who lost approximately 2% of her pay as result of transfer to day shift did not suffer adverse employment action); *Waters v. City of Dallas*, 2012 WL 5363426, at *10 (N.D. Tex. Nov. 1, 2012)(finding no adverse employment action where "the undisputed evidence is that the transfer was from a night to day shift, and the objective evidence is that the reduction in pay was due only to a loss of the night shift differential").

However, plaintiff also testified at his deposition that his transfer to the day shift caused him to lose seniority, a fact that

defendant has not rebutted. "[L]oss of seniority can be an adverse employment action." *Gaines v. New York City Transit Auth.*, 528 F. Supp. 2d 135, 147 (E.D.N.Y. 2007); *see also United States v. Brennan*, 650 F.3d 65, 95 n.36 (2d Cir. 2011) ("loss of transfer and layoff seniority is enough to show a materially adverse change in the terms and conditions of employment.") (internal quotation omitted). As a result, and considering the facts in the light most favorable to plaintiff, the Court concludes that a genuine issue of material fact exists regarding whether plaintiff's transfer to the day shift constituted an adverse employment action.

The Court notes that plaintiff has not specifically identified any other alleged adverse employment actions. However, in light of plaintiff's *pro se* status and in the interest of justice, the Court has considered whether any of the following constitute adverse employment actions: (1) plaintiff's receipt of written counselings; (2) plaintiff's placement on administrative leave with pay; (3) defendant's requirement that plaintiff attend sexual harassment prevention training; and (4) plaintiff's four week suspension without pay.

With respect to plaintiff's receipt of written counselings, "these . . . instances of routine discipline . . . [did not] constitute[] a 'materially adverse change' in the terms and conditions of [plaintiff's] employment sufficient to sustain a Title VII discrimination claim." *Taylor v. Seamen's Soc. For*

*Children*, 2013 WL 6633166, at *13 (S.D.N.Y. Dec. 17, 2013) (collecting cases); *see also Oliphant v. Connecticut Dep't of Transp.*, 2006 WL 3020890, at *7 (D. Conn. Oct. 23, 2006) ("Counseling letters, like negative evaluations or other forms of workplace reprimands, are not disruptive enough to rise to the level of 'adverse employment actions.'").

Similarly, with respect to defendant requiring plaintiff to attend sexual harassment prevention training, "a finding of sexual harassment alone does not rise to the level of an adverse employment action. Nor does the requirement that an employee participate in sexual harassment training, as such a requirement does not impact the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way." *Soloski v. Adams*, 600 F. Supp. 2d 1276, 1356 (N.D. Ga. 2009) (citation omitted); *see also Brown v. CSX Transportation Inc.*, 155 F. Supp. 3d 265, 271 (W.D.N.Y. 2016) (noting that "courts typically find that requiring an employee to attend training is not considered an adverse employment action").

With respect to plaintiff having been placed on administrative leave with pay while Ms. Hancoski's allegations against him were investigated, the Second Circuit has expressly held that "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir.

2006). Here, there was nothing unusual or dilatory about defendant's placement of plaintiff on administrative leave that would constitute an adverse employment action.

However, defendant's decision to place plaintiff on a four week suspension without pay in December 2010 clearly constitutes an adverse employment action. *See, e.g., Rupert v. City of Rochester, Dep't of Envtl. Servs.*, 701 F. Supp. 2d 430, 440 (W.D.N.Y. 2010) ("A suspension without pay qualifies as an adverse employment action."); *McInnis v. Town of Weston*, 458 F. Supp. 2d 7, 13 (D. Conn. 2006) ("the Second Circuit has long held that a suspension without pay, for which a plaintiff receives no backpay, is an adverse employment action").

For the foregoing reasons, the Court disagrees with defendant and finds that plaintiff has met his burden, at this stage of the proceedings, of producing evidence that he suffered an adverse employment action. Accordingly, the rest of the Court's analysis assumes that the transfer to the day shift and the suspension without pay constituted adverse employment actions.

### 2. Circumstances Giving Rise to Inference of Discrimination

The fourth and final element of a *prima facie* discrimination case is the existence of circumstances giving rise to an inference of discrimination. "Circumstances contributing to a permissible inference of discriminatory intent may include . . . the employer's criticism of the plaintiff's performance in ethnically degrading

17

terms . . . or its invidious comments about others in the
employee's protected group . . . or the more favorable treatment of
employees not in the protected group . . . or the sequence of
events leading to the [adverse employment action] . . . or the
timing of the [adverse employment action]." *Chambers v. TRM Copy
Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal citations
omitted). "Since the court, in deciding a motion for summary
judgment, is not to resolve issues of fact, its determination of
whether the circumstances 'giv[e] rise to an inference' of
discrimination must be a determination of whether the proffered
admissible evidence shows circumstances that would be sufficient to
permit a rational finder of fact to infer a discriminatory motive."
*Id.*

Here, defendant argues, and the Court agrees, that plaintiff
has failed to produce any evidence from which a rational fact-
finder could conclude that RPC acted with a discriminatory motive.
Significantly, plaintiff himself testified at deposition that he
did not know why defendant had taken adverse action against him,
stating, "I believe that there was an unequal working condition
where the defendants took my complaint and turned it around on me.
Why? <u>Male, black, just don't like me, I don't know</u>." Docket No.
182-3 at 52 (emphasis added). Further, when asked if he believed
that either Ms. Hancoski or Ms. Uerkvitz had a racial or gender
bias against him, plaintiff stated that he "[could not] answer

that." *Id*. at 52-53.

Conclusory allegations of bias, without more, "are insufficient to oppose summary judgment." *Brown v. Xerox Corp*., 170 F. Supp. 3d 518, 532 (W.D.N.Y. 2016). Here, there is no evidence of direct racial or gender discrimination against plaintiff, such as the making of inappropriate comments or the use of epithets or slurs. There is also no competent evidence that other, similarly-situated employees were treated more favorably than him. "Although the Second Circuit . . . has stated that the burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minimis*, it has also noted that [a] jury cannot infer discrimination from thin air." *Id*. (internal quotation omitted). In this case, there is simply nothing from which a jury could conclude that RPC was motivated by a discriminatory intent. Accordingly, defendant's motion for summary judgment must be granted as to plaintiff's disparate treatment claim.

### 3. Non-Pretextual, Legitimate, Non-Discriminatory Reasons

As set forth above, plaintiff has failed to establish a *prima facie* case of disparate treatment. However, assuming that plaintiff could make out a *prima facie* case, defendant would still be entitled to summary judgment because it has articulated legitimate, non-discriminatory reasons for reassigning plaintiff to the day shift, and there is no competent evidence that these

19

reasons were pretextual.

Defendant maintains that plaintiff was transferred to the day shift as a result of his repeated conflicts with his co-workers on the night shift. These conflicts are well-documented and clearly created serious issues that defendant was required to address. Similarly, plaintiff's four week suspension without pay was based on his having made inappropriate, threatening comments to Ms. Uerkvitz. Even accepting plaintiff's version of his conversation with Ms. Uerkvitz, he admits to having told a co-worker that he admired a fictional serial killer and wished he could be like him. This statement is clearly inappropriate in the workplace, and RPC was entitled to take appropriate disciplinary action.

There is no evidence that defendant's stated reasons for its actions were pretextual. "A plaintiff may show pretext by proving either that the employer was more likely motivated by a discriminatory reason or that the proffered explanation is not credible." *Francois v. Office of Mental Health of State of N.Y., Bronx Psychiatric Ctr.*, 715 F. Supp. 69, 73 (S.D.N.Y. 1989). As discussed above, there is no evidence in this case that RPC was motivated by discriminatory intent. Moreover, its proffered explanation for its action is credible, being well-supported by contemporaneous documentation.

The Court notes that plaintiff has claimed that another RPC employee, Vicky Snyder, was pressured by Ms. Crowell to make a

false allegation against him. In support of this claim, plaintiff points to a letter allegedly authored by Ms. Snyder in which she states that she felt pressured by Ms. Crowell (and other employees at RPC) to provide evidence against plaintiff. Plaintiff has failed to show that Ms. Snyder's letter is competent evidence of pretext. As a threshold matter, the letter in question is unsworn, and Ms. Snyder does not appear to have ever provided sworn testimony on this matter. "'[U]nsworn statements are not admissible to controvert a summary judgment motion.'" *Ventura v. Attea*, 102 F. Supp. 3d 464, 469 (W.D.N.Y. 2015) (quoting *Dukes v. City of New York*, 879 F.Supp. 335, 343 (S.D.N.Y. 1995)). Moreover, and contrary to plaintiff's argument, Ms. Snyder's statement does not claim that Ms. Crowell pressured her to make a false allegation against plaintiff. Instead, Ms. Snyder reports that Ms. Crowell questioned her repeatedly regarding whether the incident between plaintiff and Ms. Hancoski had occurred in May 2009 or May 2010, because RPC's "statute of limitations" for issuing discipline was one year. *See* Docket 209-3 at 52-53. Ms. Snyder further states that she had reported an issue with Mr. Freeman to RPC in May 2010 and that Ms. Crowell asked her to provide additional information about this incident because it was within the "statute of limitations." *Id.* Nowhere does Ms. Snyder say, nor does her letter imply, that RPC management asked her to make a false statement against plaintiff. For all these reasons, Ms. Snyder's

statement does not constitute competent evidence of pretext. Accordingly, the Court concludes that defendant is entitled to summary judgment on plaintiff's disparate treatment claim.

**C.  Hostile Work Environment Claim**

Plaintiff also argues that he has been subjected to a hostile work environment. In order to succeed on a hostile work environment claim, plaintiff must show that the complained of conduct: (1) 'is objectively severe or pervasive — that is, . . . creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's [membership in a protected class].'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)).

Assuming without deciding that plaintiff has presented sufficient evidence of an objectively hostile work environment, plaintiff's hostile work environment fails for the same reason as his disparate treatment claim - namely, there is no evidence that anyone at RPC was motivated by racial or gender bias.  Indeed, and as noted above, plaintiff conceded at his deposition that, as far as he knew, it was entirely possible that RPC and its management simply did not like him.  Simply put, Title VII does not protect a plaintiff from "an uncomfortable workplace environment, as opposed

22

to discriminatory animus." *Brodt v. City of New York*, 4 F. Supp. 3d 562, 569 (S.D.N.Y. 2014) (collecting cases); *see also Lennert-Gonzalez v. Delta Airlines, Inc.*, 2013 WL 754710, at *8 (S.D.N.Y. Feb. 28, 2013) ("Personal animus . . . is insufficient to establish a claim under Title VI. . . ."). Accordingly, defendant is entitled to summary judgment in its favor on plaintiff's hostile work environment claim.

### D. Retaliation Claim

Plaintiff has also alleged that defendant retaliated against him for his complaints against his co-workers. It is impermissible for an employer to discriminate against an employee for opposing any practice made unlawful by Title VII. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59–60 (2006); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). Title VII's anti-retaliation "prevent[s] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII]'s basic guarantees." *Burlington*, 548 U.S. at 63.

"Retaliation claims . . . are evaluated using a three-step burden-shifting analysis. First, the plaintiff must establish a *prima facie* case of retaliation. If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory. If the employer succeeds at the second stage, then the presumption of retaliation dissipates

and the plaintiff must show that retaliation was a substantial reason for the complained-of action." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (citations omitted). To establish a *prima facie* case of retaliation, "a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find [1] that [ ] he engaged in protected participation or opposition under Title VII . . ., [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action." *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir. 2006). For the reasons set forth below, the Court finds(1) that plaintiff has failed to establish a *prima facie* case of retaliation and (2) that there was no causal connection between protected activity and the adverse employment actions taken by defendant. Moreover, the Court finds that defendant had legitimate, non-retaliatory, non-pretextual reasons for its actions.

### 1. Engagement in Protected Activity

As a threshold matter, plaintiff has failed to present credible evidence that he engaged in protected activity. "A plaintiff engages in 'protected activity' when []he (1) opposes employment practices prohibited under Title VII; (2) makes a charge

24

of discrimination; or (3) participates in an investigation, proceeding or hearing arising under Title VII." *Bundschuh v. Inn on the Lake Hudson Hotels, LLC*, 914 F.Supp.2d 395, 405 (W.D.N.Y.2012). "[I]n order to constitute a protected activity for purposes of a retaliation claim, the complaint must be related to discrimination on a basis prohibited by Title VII." *Bennett v. Hofstra Univ.*, 842 F.Supp.2d 489, 500 (E.D.N.Y. 2012). Moreover, the plaintiff must have had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers*, P.C., 716 F.3d 10, 14 (2d Cir. 2013)(internal quotation omitted).

Here, there is simply no evidence that any of the complaints made by plaintiff were related to unlawful discrimination, or that he had a good faith, reasonable belief that Title VII had been violated. Plaintiff's grievances related to Ms. Weaver, Ms. Hancoski, and Ms. Sanders made no mention whatsoever of racial or gender bias, nor was there any other information contained therein to put defendant on notice that plaintiff was claiming unlawful discrimination. "[I]it is objectively unreasonable for a plaintiff to believe that conduct not motivated by membership in a protected class is unlawful." *Davis v. NYS Dep't of Corr. Attica Corr. Facility*, 110 F. Supp. 3d 458, 463 (W.D.N.Y. 2015) (citing *Johnson v. City Univ. of N.Y.*, 48 F.Supp.3d 572, 577 (S.D.N.Y. 2014)). Indeed, at his deposition, plaintiff testified that he could not

answer a question regarding whether Ms. Hancoski's and Ms. Uerkvitz's allegations against him were motivated by discriminatory animus. Under these circumstances, the Court concludes that plaintiff cannot demonstrate that he engaged in protected activity and, accordingly, cannot establish a *prima facie* case of retaliation.

## 2. Causal Connection

Assuming that plaintiff had engaged in protected activity, he has failed to produce competent evidence of any connection between that activity and any adverse employment action. "Proof of a causal connection between the protected activity and adverse action can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Brown v. Xerox Corp.*, 170 F. Supp. 3d 518, 529-30 (W.D.N.Y. 2016). Here, there is neither direct nor indirect evidence of retaliatory animus. Although plaintiff has made a conclusory argument that other employees' complaints were taken more seriously than his, he has failed to produce any competent evidence to substantiate that claim. Moreover, there is evidence in the record that plaintiff was complaining about his coworkers as early as July 2009, yet no

adverse action was taken against him until September 2010. "This is simply too remote to support a *prima facie* case of causation based on temporal proximity." *Id*. at 530 (finding that a lapse of nine to eighteen months between the alleged protected activity and the adverse employment action was insufficient to show a causal relation). Plaintiff's attempt to set forth a *prima facie* claim for retaliation therefore also fails on this ground.

### 3.    Non-Pretextual, Legitimate, Non-retaliatory Reasons

Finally, the Court finds that, even if plaintiff could establish a *prima facie* case of retaliation, defendant has set forth legitimate, non-discriminatory reasons for its actions, and there is no evidence those reasons are pretextual. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir.2013). "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Id.* at 847. Here, and as previously discussed, plaintiff has failed to produce or identify any competent evidence contradicting or otherwise calling into question defendant's proffered reasons for its actions. Accordingly, defendant is entitled to summary judgment on plaintiff's retaliation claim.

### E. Plaintiff's Pending Sanctions Motions

The Court notes that plaintiff has filed two motions for sanctions against defendant (Docket Nos. 190, 213), each of which asks the Court to determine that defendant (or its agents) have committed perjury and to grant judgment to plaintiff as a sanction. The Court has reviewed these motions and finds that plaintiff has presented no competent evidence of perjury by defendant or its agents. Moreover, to the extent that plaintiff seeks a criminal sanction, such relief is unavailable in this civil matter. Accordingly, plaintiff's pending motions for sanctions are denied.

### IV. Conclusion

For the reasons set forth above, the Court grants defendant's motion for summary judgment (Docket No. 182) and denies plaintiff's cross-motion for summary judgment(Docket No. 209). The Court also denies motions for sanctions (Docket Nos. 190, 213). The Clerk of the Court is instructed to enter judgment in favor of defendant and to close the case.

**ALL OF THE ABOVE IS SO ORDERED.**

s/Michael A. Telesca

_____

MICHAEL A. TELESCA
United States District Judge

Dated:      September 20, 2017
            Rochester, New York